## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| WESTWIND MANOR RESORT | § | Case No. 19-50026 (DRJ) |
| ASSOCIATION, INC., *et al.* | § | (Chapter 11) |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| FORCE 10 AGENCY SERVICES LLC, | § | |
| TRUSTEE OF THE CREDITOR TRUST | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| VS. | § | ADV. P. NO. _____ |
| | § | |
| BRENDAN M. FLAHERTY | § | |
| BMF PROPERTIES, LLC; | § | |
| WARRIOR GOLF, LLC; | § | |
| WHOLESALE GOLF SUPPLY & | § | |
| SERVICES, INC.; | § | |
| DOT COM ASSET MANAGEMENT, LTD.; | § | |
| WARRIOR CUSTOM STORAGE & RV, LP, | § | |
| RIVERBOUND STORAGE | § | |
| MANAGEMENT, LLC | § | |
| CIMARRON FOOD AND BEVERAGE, INC.; | § | |
| WOLF CREEK FOOD AND | § | |
| BEVERAGE, LLC; | § | |
| WARRIOR TENNESSEE FOOD AND | § | |
| BEVERAGE, LLC; | § | |
| DWIGHT BECKSTRAND | § | |
| (D/B/A BECKSTRAND LAW OFFICES); | § | |
| REED A. COLEY; AND | § | |
| COLEYDOCTER, INC. | § | |
| | § | |
| *Defendants.* | § | |

## TRUSTEE'S ORIGINAL COMPLAINT

TO THE HONORABLE DAVID R. JONES, CHIEF UNITED STATES BANKRUPTCY JUDGE:  COMES NOW, PLAINTIFF FORCE 10 AGENCY SERVICES LLC, TRUSTEE OF THE CREDITOR TRUST in the above captioned consolidated Chapter 11 cases and files this Original Complaint, and for cause of action would show as follows:

1

**I.**
**Jurisdiction and Venue**

1.      This adversary proceeding is commenced in accordance with Rule 7001(1) of the Federal Rules of Bankruptcy Procedure.

2.      This Court has subject-matter jurisdiction over this over this action pursuant to 28 U.S.C. §1334(b) because this adversary proceeding arises in, arises under, and/or relates to the Westwood Manor Resort Association, Inc., and affiliates, chapter 11 Cases.

3.      This adversary proceeding contains "core" claims pursuant to 28 U.S.C. §157(b)(2).

4.      Pursuant to Federal Rule of Bankruptcy Procedure 7008, the Unsecured Creditor Trustee consents to entry of a final order or judgment by the Bankruptcy Court in this matter.

5.      Venue is proper in this district under 28 U.S.C. §1409(a).  This adversary proceeding is related to bankruptcy cases under Chapter 11 of the Bankruptcy Code that is pending in this district as consolidated case number 19-50026.

**II.**
**Parties**

6.      Plaintiff Force 10 Agency Services LLC, in its capacity as the Creditor Trustee (the "**Creditor Trustee**") of the Warrior Creditor Trust (the "**Creditor Trust**") pursuant to the Plan as confirmed by the Confirmation Order (as such terms are defined below) in the above-referenced jointly administered cases of Westwind Manor Resort Association, Inc., et al., hereby files this Original Complaint.

7.      Defendant Mr. Brendan M. Flaherty ("**Flaherty**") is a California resident and may be served through his counsel of record in this matter, Matthew A. Lesnick, Lesnick Prince & Pappas LLP, 315 W. Ninth St., Suite 705, Los Angeles, CA 90015.

8.    Defendant BMF Properties, LLC ("**BMF Properties**") is a California limited liability company whose registered agent is Brendan Flaherty, who may be served through his counsel of record in this matter, Matthew A. Lesnick, Lesnick Prince & Pappas LLP, 315 W. Ninth St., Suite 705, Los Angeles, CA 90015.

9.    Defendant Warrior Golf LLC, ("**Warrior Golf**") is a California limited liability company which may be served through its counsel of record in this matter, Matthew A. Lesnick, Lesnick Prince & Pappas LLP, 315 W. Ninth St., Suite 705, Los Angeles, CA 90015.

10.    Defendant Wholesale Golf Supply & Services, Inc. ("**Wholesale Golf**") is a California corporation which may be served through its counsel of record in this matter, Matthew A. Lesnick, Lesnick Prince & Pappas LLP, 315 W. Ninth St., Suite 705, Los Angeles, CA 90015.

11.    Dot Com Asset Management, Ltd. ("**Dot Com**") is a California corporation which may be served through its counsel of record in this matter, Matthew A. Lesnick, Lesnick Prince & Pappas LLP, 315 W. Ninth St., Suite 705, Los Angeles, CA 90015.

12.    Warrior Custom Storage & RV, LP, ("**Riverbound Storage**") a Delaware limited partnership and may be served via its registered agent, GKL Registered Agents of DE, Inc., 3500 S. Dupont Hwy, Dover, DE 19901.

13.    Riverbound Storage Management, LLC, ("**Riverbound Management**") is a Delaware limited liability corporation and may be served via its registered agent, Ryan Rodney, 230702 Birtcher Dr., Lake Forest, CA 92630.

14.    Cimarron Food and Beverage, Inc. ("**Cimmarron**") is a California corporation whose registered agent is Brendan Flaherty, who may be served through his counsel of record in this matter, Matthew A. Lesnick, Lesnick Prince & Pappas LLP, 315 W. Ninth St., Suite 705, Los Angeles, CA 90015.

15.   Wolf Creek Food and Beverage, LLC ("**Wolf Creek**") is a Georgia limited liability corporation and may be served via its registered agent, Mark Abrams, 3000 Union Road SW, Atlanta, GA 30331.

16.   Warrior Tennessee Food and Beverage, LLC ("**Warrior F&B**") is a Tennessee limited liability corporation and may be served via its registered agent, Warrior Golf Capital, LLC, 704 Harrison Ferry Rd, Baneberry, TN 37890-4931.

17.   Defendant Dwight Beckstrand (d/b/a Beckstrand Law Offices (collectively, "**Beckstrand**")) is an individual resident of the state of Utah who may be served via mail at his place of business, Beckstrand Law Offices, P.O. Box 188, Kanosh, Utah 84637-0188.

18.   Defendant Reed A. Coley is an individual resident of California who may be served at 420 Stevens Ave, Suite 310, Solana Beach, CA 92075.

19.   Defendant ColeyDocter, Inc. is a California corporation and may be served via its registered agent, Reed A. Coley, 420 Stevens Ave, Suite 310, Solana Beach, CA 92075.

### III.
### Background Facts

**A.   General Background**

20.   On June 15, 2020, the Court entered that certain *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Joint Chapter 11 Plan as of March 22, 2020* [Docket No. 999] (the "**Confirmation Order**"), confirming the *Debtors' and Committee's First Amended Joint Plan of Reorganization* [Docket No. 787] (the "**Plan**").

21.   On August 5, 2020, the Debtors filed that certain *Notice of: Confirmation of Plan, Permanent Injunction, Various Deadlines, Effective Date; and Deadline for Filing Administrative Claims and Claims Arising from the Rejection of Executory Contracts and Unexpired Leases* [Docket

No. 1087], setting forth that, inter alia, the Effective Date (as such term is defined in the Plan) occurred on August 5, 2020 (the "**Effective Date**").

22.   The Confirmation Order and Plan, among other things, approved the formation of the Creditor Trust and the appointment of the Creditor Trustee to administer the Creditor Trust. *See, e.g.,* Confirmation Order, at ¶¶ K, 14-18; Plan, at § 5.15.

23.   Section 5.13 of the Plan provides that:

> As of the Effective Date, all Causes of Action, except the Assigned Estate Claims, shall vest exclusively in the Reorganized Debtors. Notwithstanding the forgoing, the Reorganized Debtors may, without further order of the Bankruptcy Court, assign, in any fashion, any Cause of Action to the Creditor Trust, in which event the Creditor Trust shall be vested with full title to such Cause of Action, as if it was an Assigned Estate Claim, as of the Effective Date.

> As of the Effective Date, all Assigned Estate Claims shall vest exclusively in the Creditor Trust.

> As of the Effective Date all of Direct Causes of Action (save for those owned by LLC Investors or Convertible Noteholders that have properly exercised the Direct Opt Out Right), and the WGP Causes of Actions (save for those owned by WGP Investors that have properly exercised the WGP Opt Out Right) shall vest exclusively in the Creditor Trust.

24.   Section 1.02(6) of the Plan defines "**Assigned Estate Claims**" as:

> (a) Avoidance Actions and (b) any and all of the Estates' direct or derivative claims or Causes of Action against any Excluded Party, including, for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, bad faith, willful misconduct, Securities Violations, or for Commercial Tort Claims. Assigned Estate Claims include, the Direct Causes of Action assigned pursuant to the Direct Causes of Action Assignment, WGP Causes of Action assigned pursuant to the WGP Causes of Action Assignment, and any and all Causes of Action arising under WGP Investments, assigned pursuant to the WGP Investment Assignments.

25.   Section 1.02 of the Plan defines "**Causes of Action**" as:

> all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims, or any other claims whatsoever, whether known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, disputed or

5

undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring before the First Petition Date or during the course of these Chapter 11 Cases, including through the Effective Date. Causes of Action include, but are not limited to, Avoidance Actions, claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, bad faith, willful misconduct, Securities Violations, Commercial Tort Claims, fraudulent transfer, preferential transfer, unauthorized post-petition transfer under Section 549 of the Bankruptcy Code, turnover under Sections 542 and/or 543 of the Bankruptcy Code, subordination, recharacterization of debt to equity, malpractice, constructive trust, disgorgement, counterclaims, claims to determine extent and validity of liens under Section 506 of the Bankruptcy Code, breach of contract, breach of the implied covenant of good faith and fair dealing, common law and statutory conspiracy, civil remedies against racketeer influenced and corrupt organizations under Chapter 96 of Title 18 of the United States Code, overpayment, unjust enrichment, fraud, negligent misrepresentation, tortious interference with contract or prospective economic advantage, civil conspiracy, whether under feral law or the laws of any state, equitable subordination, including under Bankruptcy Code Section 510(c), aiding and abetting any act or omission of any Person or Entity, objections to fees, and interest or other charges paid by the Debtors.

26. Section 5.15 of the Plan provides:

In accordance with Bankruptcy Code Section 1123(b), the Creditor Trust shall retain and may enforce all of the Debtors' rights to commence and pursue, as appropriate, any and all of the Assigned Estate Claims, and the Creditor Trust's rights to commence, prosecute, or settle such Assigned Estate Claims shall be preserved notwithstanding the occurrence of the Effective Date. The Creditor Trust may pursue such Assigned Estate Claims, as appropriate, in accordance with the Creditor Trust Agreement.

27. Lastly, Paragraph R of the Confirmation Order provides, in part:

The Plan also provides that after the Effective Date, the Reorganized Debtors and the Creditor Trustee, with respect to Assigned Estate Claims, in their sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Causes of Action, Avoidance Actions or Assigned Estate Claims, as applicable (or decline to do any of the foregoing), without further approval of this Court.

28. Therefore, the Creditor Trustee of the Creditor Trust pursuant to the Plan as confirmed by the Confirmation Order as described above brings the following Causes of Action for Assigned Claims against Defendants including Flaherty, an excluded party, for Breaches of Fiduciary Duty, Negligence, and Gross Negligence directly on behalf of the Creditor Trust, including all Assigned

6

Estate Claims as defined above, including those claims assigned to it via the WGP Investment Assignments by the investors in various Warrior related LLCs the ("**LLC Investors**") (as defined in the Plan). All of these LLC Investors are now beneficiaries of the Creditor Trust, and the four LLC Investors that originally opted out of the assignment have each assigned their causes of action against Flaherty to the Trustee via the WGP Investment Assignments.[1]

      **B.**    **Warrior Investment Raising and the Golf Course Business**

29.   In 1998, Flaherty begun selling custom built golf clubs *via* telephone directly to consumers. Flaherty created Warrior Custom Golf, LLC ("**Custom Golf**") to conduct this business.

30.   While the initial business of Custom Golf was to generate revenue from the sale of golf clubs and accessories, Custom Golf also generated a massive "Rolodex" of sales leads and "pre-existing relationships" which became crucially important for the next stages of Warrior's businesses. The customer database contained the contact information for people that responded favorably to pitches and promotional offers to purchase golf clubs, golf balls and other golf related promotions. Importantly, the customer database included people with a demonstrated receptivity to telephone sales and a love of golf.

31.   Commencing in 2004, Flaherty created a new and additional business model to capitalize on the customer database. Using information developed from the sale of golf equipment, Flaherty began aggressively telemarketing securities to Custom Golf's customers. Customers that purchased these securities became the LLC Investors and their investments ultimately funded (i) the purchase of 21 golf courses throughout California, Florida, Colorado, Iowa, Indiana, Alabama, North Carolina, South Carolina, Tennessee and Georgia – the acquired golf course became the "**Golf Course Business**", (ii) the operations of the Golf Course Business, and (iii) the sales machine to sell securities

---

[1] Those investors are Frank Stumpo, Terry Johnson, and the Equity Trust Custodian for the benefit of James Haefeli (181472) and James Taylor (187050).

to customers and turn them into LLC Investors (the "**Investment Raising Business**"). The Golf Course Business, the management of the golf courses and the Investment Raising Business were owned and operated through a series of affiliated limited liability companies each an LLC ("**LLCs**") controlled directly or indirectly by Flaherty.[2]

32.  Ultimately, the Investment Raising Business was ***a sham designed to raise money for improper purposes*** and not a business designed to profitably invest in golf courses. The LLCs were never reasonably expected to result in a meaningful return for LLC Investors. In fact, the Golf Course Business was operated with extensive annual losses and the Investment Raising Business functioned as a vehicle to fund numerous improper payments and distributions to Flaherty, the Non-Debtor Flaherty Entities and his associates fueled not by investment returns but finding more and more LLC Investors to invest in new LLCs that did not have any reasonable prospect of operating profitably or generating a positive return. The Investment Raising Business appears to have been intentionally undertaken without any business plan, without legitimate or reasonable budgets for the use of the raised funds, and without any reasonable projections for the enterprise.

33.  Over the course of 15 plus years, Warrior, through the Investment Raising Business, raised more than $107 million from more than 1,700 individuals and entities, many of which invested their hard-earned retirement funds. The Investment Raising Business utilized a systematic boiler room structure for obtaining 'investments' from individuals and families with no plausible or anticipated investment return to LLC Investors. A centerpiece of the sales pitch for the Investment

---

[2] These LLC's include the Debtors in these cases (which along with the last four digits of each Debtor's federal tax identification number), are as follows: Westwind Manor Resort Association, Inc. (7533); Warrior ATV Golf, LLC (3420); Warrior Acquisitions, LLC (9919); Warrior Golf Development, LLC (5741); Warrior Golf Management, LLC (7882); Warrior Golf Assets, LLC (1639); Warrior Golf Venture, LLC (7752); Warrior Premium Properties, LLC (0220); Warrior Golf, LLC, a Delaware limited liability company (4207); Warrior Custom Golf, Inc. (2941); Warrior Golf Equities, LLC (9803); Warrior Golf Capital, LLC (5713); Warrior Golf Resources, LLC (6619); Warrior Golf Legends, LLC (3099); Warrior Golf Holdings, LLC (2892); and Warrior Capital Management, LLC (8233), as well as certain non-debtors such as BMF Properties, Warrior Golf, Wholesale Golf, Dot Com, Riverbound Storage, Riverbound Management, Cimmaron, Wolf Creek, and Warrior F&B (collectively, the "**Non-Debtor Flaherty Entities**").

Raising Business was the promise of non-existent high rates of return to unsophisticated golf aficionados.

34.  As part of this sales method, Flaherty created detailed call scripts that he expected employees to follow verbatim for identifying and grooming potential investors and then closing securities sales to them.  Warrior's employees were continually instructed to "SMILE AND DIAL!" and "READ WORD FOR WORD JUST LIKE AN ACTOR IN A PLAY!"  With the promise that they would "MAKE $1,000+ PER WEEK FOLLOWING THESE TWO SIMPLE RULES!".  Flaherty's control and micromanagement of the investment raising business is evidenced by his continual refinement of the scripts and his requirement that salespeople not deviate from the scripts.

35.  Once a salesperson groomed a potential investor and purported to "qualify" them to make the investment, the Investment Raising Business would mail out a private placement memorandum (a "**PPM**") to the potential investor.  These PPMs were designed to try to avoid violating state and federal securities laws while simultaneously providing false and misleading information to the potential investor about the "opportunity" to invest in golf courses.

36.  The PPMs intentionally failed to provide any business plans, budgets, good faith estimates of operations, or any financial information or projections for the LLCs or the proposed Managers of the LLC.  The PPM for Warrior Premium Properties, LLC (one of the LLCs, and one of the Debtors), for example, stated that: "There are no financial statements available for the Company or either of the Managers."

37.  The PPMs disclosed false caps on the maximum fees that would be charged in setting up and administering the LLCs and falsely stated that there would be no sales commissions paid.[3]

---

[3] Avoiding paying sales commissions as part of the investments was also important under state and federal securities laws.  If securities are sold on a commissioned basis there are strict licensing and disclosure regimes for the sales personnel and the securities are subject to heightened regulation.  Flaherty's practice of intentionally disguising commissions as wages may have also violated various state and federal securities laws.

The PPM for Warrior Premium Properties, LLC stated "*We are offering the Units for sale by agents and employees of the Managers without sales commission or other remuneration on a "best efforts" basis.*"  Flaherty would then circumvent these false representations and state and federal securities laws by not explicitly paying commissions on the sale of securities but instead regularly adjusting salaries of its boiler-room employees to equal approximately 10% of their gross sales of LLC interests — creating a 10% commission structure in everything but name.  All of this was intentionally hidden from LLC Investors.

38.    However, Flaherty had no experience or expertise in acquiring, developing, improving or operating Golf Courses.  The actual efforts of Flaherty and the performance of the LLCs completely contradicted the boisterous touting of the efforts of Flaherty and his companies contained in the PPMs.  In reality, the core focus of the Investment Raising Business was to find the next distressed golf courses when needed to fill out the portfolio for each LLC so that the commissioned sales team would have something to sell.  During much of this period Warrior was the dominant purchaser of distressed public courses. The courses Flaherty purchased were distressed for obvious reasons.  Flaherty ignored these challenges and had no plan to improve the performance of the courses.  Flaherty's objective was to amass more and more courses to feed his investment machine. He had no actual business plan to turn them around – just to acquire them.  Warrior was the preferred target for golf course brokers because it was not focused on the fundamentals of the courses or their ability to be run profitably.  Rather, Warrior was focused on buying low-price and low-quality courses that they could conveniently place into their LLCs.

39.    The story of the rise and fall of Warrior is not unique.  At its heart the Investment Raising Business was nothing more than a confidence scheme driven by greed, arrogance, and high-pressure sales tactics.  The sales tactics of the Investment Raising Business preyed on vulnerable investors by falsely stroking their egos, playing on the passions of its often-elderly targets, creating the appearance

of "personal" relationships with LLC Investors, and ultimately capitalizing on the vulnerabilities of unsophisticated investors with promises of outsized returns and the dream that they would be able to play at golf courses they owned.

### C.   ATV Golf Transaction

40.   Beginning in 2004, Flaherty launched the first of the LLC's which would become a Debtor: Warrior ATV Golf, LLC ("**ATV Golf**").  Flaherty's idea for ATV Golf was absurd, to put it mildly.  Flaherty wanted to purchase raw land (which happened to be entirely landlocked with no access to any public roads) in a rural area far from any population center and develop it into a 'one of a kind' golf course on which golfers would use all-terrain vehicles rather than golf carts to travel between rugged holes.

41.   To pursue the alleged purpose of ATV Golf, the Investment Raising Business raised in excess of $13.7 million from various LLC Investors.   The early pitch materials for ATV Golf contained the following:

### FIRST ALL TERRAIN GOLF COURSE IN THE WORLD!

> Imagine the excitement of riding in specially designed All Terrain Vehicles as you navigate over desert flatlands, rolling hills or extreme elevations with spectacular tee box views.  Or riding an amphibious ATV to the island green of our signature hole.[4]

42.   In April 2005, Flaherty, through an entity, purchased approximately 300 acres of inaccessible and unentitled raw land in Moreno Valley, California (the "**ATV Land**") from four different third-party sellers for $2.2 million.

43.   Just four months later, on October 21, 2005, Flaherty caused his entity to sell the ATV Land to ATV Golf for an inflated $3 million.  This was only the beginning of his malfeasance.  Not only did he flip the course to an entity he controlled for an $800,000 profit utilizing LLC Investor

---

[4] Needless to say, the land purchased was in rolling hills filled with scrub brush and there were no flatlands, dessert, water features or islands.

funds, but Flaherty also raised far more capital than needed from the LLC Investors in a scheme reminiscent of the movie "The Producers."  Ultimately, the Investment Raising Business raised $13,728,750 for ATV Golf without any real budgets, construction plans or even entitlements to support the investment.  ATV Golf then used $3,000,000 to purchase the inflated ATV Land from an affiliate of Flaherty, leaving it over $10.7 million for "development."  In reality ATV Golf now had a $10.7 million slush fund for Flaherty and to keep his boiler room churning on other investment raises.[5]  By designing a project with no financial accountability or oversight and no chance of being built, and then selling it to unsophisticated investors, Flaherty was free to squander the $10.7 million of excess funds without the risk that investors could or would ever visit the project, let alone look to closely at the investment, after he tried and failed to develop his 'First in the World' project.  With the ease of raising money for ATV Golf under his belt, Flaherty refined his scheme, and the Golf Course Business was born.

44.    In 2010, after it became abundantly clear that the ATV Land could not be developed into a golf course, the project was scrapped.  Investors were never informed of this fact and their remaining investments in ATV Golf were never returned.  In fact, for years to come the Investment Raising Business touted the existence and potential development of the ATV Land as a success in its PPMs, call scripts and other marketing materials.[6]  Today, over 15 years after its acquisition, the ATV Land remains unentitled and undeveloped raw land.

---

[5] Warrior's books and records do not reflect any significant expenditures to develop the ATV Land other than some early efforts to have the land entitled as a golf course which the county was loath to allow given the lack of water rights, the pervasive drought facing Southern California, the absence of any environmental impact surveys, the absence of any development plans and even the absence of any meaningful access to the land.

[6] As of September 30, 2015, 10 years after its acquisition, the Investment Raising Business continued to tell investors that "The proposed plans for the development of that golf course, however, are still being reviewed by local governmental agencies."

**D.    Creation of the Serial Investment LLCs and their Mismanagement**

45.    Recognizing that buying raw land for developing future golf "concepts" like an ATV golf course was unnecessarily cumbersome and the opportunities were difficult to source, Warrior pivoted to a simpler model of overpaying for distressed golf courses and packaging them into LLCs to sell to investors.  The Investment Raising Business could still raise more money than was needed for the courses so that Flaherty and his boiler room had their slush fund, but now they had actual golf courses that investors could visit and play at to to entice them to make new investments.  Also, by raising far more than the equity needed to purchase and operate the courses, the LLCs could avoid taking on bank debt and thereby escape any lender oversight.

46.    From 2007 through 2015, Warrior created at least eleven additional LLCs (all with Flaherty, or a Flaherty controlled entity, serving as the manager of the LLC), raising in excess of $87 million on top of the first ATV Golf raise of $13.7 million.  Each LLC recycled the same fraudulent scheme over and over again.  Flaherty and his Investment Raising Business used the same boiler room, ever more grandiose call scripts, and recycled PPMs (sometimes barely changing the names of the entities) to raise over $101 million.  At one point, Flaherty even pretended he was going to take the Golf Course Business public and raised an additional $5 million to do so.

47.    Flaherty operated the Investment Raising Business as a serial investment scheme. Starting with ATV Golf he would use the money raised from earlier LLCs to fund the Investment Raising Business and to cover losses in the Golf Course Business all while enticing investors into funding new LLCs that were doomed to fail.  After each LLC was funded and closed, Flaherty would repeat the process.  Ultimately, from 2004 to 2015, the LLCs acquired 21 golf courses and related land scattered throughout the country, spending only $35 million of the over $101 million raised from LLC Investors plus incurring an additional $5.2 million in seller or bank loans secured by the golf courses.

48.   Throughout this process Flaherty knowingly violated applicable securities laws by paying sales commissions to employees equal to 10% of the funds raised and disguising those payments as wages.  These efforts were intentionally hid from the LLC Investors and misrepresented in the PPMs, which stated that "We are offering the Units for sale by agents and employees of the Managers without sales commission or other remuneration on a 'best efforts' basis."

49.   However, these LLCs were never focused on the fundamentals of the courses or their ability to be run profitably for the benefit of the LLC Investors.  Flaherty intentionally failed to develop or provide any business plans, budgets, good faith estimates of operations, or financial information or projections for the LLCs or the proposed Managers of the LLC for the operation of the golf courses.  The PPMs stated they had plans, as if saying they existed was enough.

50.   Flaherty furthered his scheme by causing the LLCs to enter into self-described management agreements.  He used these agreements to pay himself and the Non-Debtor Flaherty Entities[7] approximately $22.7 million.  However, as manager of the LLCs, Flaherty was prohibited from entering self-dealing agreements with affiliated entities unless they were on terms and conditions no less favorable to the LLC than the terms and conditions likely to result from arms-length negotiations with unaffiliated third parties.

51.   On top of these devices, Flaherty extracted no less than an additional $2.8 million by paying personal, non-business expenses for himself, his children and his ex-wife by charging personal expenses on business credit cards and paying the subsequent invoices with LLC funds.  Not including the payment of "commissions" to his sales team, Flaherty ultimately diverted to himself and the Non-Debtor Flaherty Entities an amount almost equal to the total purchase price of the Golf Courses.

---

[7] As defined above, the Non-Debtor Flaherty Entities include Defendants Warrior Golf, BMF Properties, Wholesale Golf, and Dot Com.

52.     To aid him in these endeavors, Flaherty retained Defendant Reed Coley, certified public accountant, and his CPA firm ColeyDocter, Inc. (collectively "**Coley**") to perform bookkeeping, accounting, tax, and other accounting related services for himself, the LLCs and the Non-Debtor Flaherty Entities.  Throughout Coley's engagement, Coley knew, or should have known, both of Flaherty's fiduciary duties to the LLCs and the LLC Investors and of the massive of misconduct, including extensive personal expenses, improper commissions, and other self-dealing engaged by Flaherty and between the Debtors and the Non-Debtor Flaherty Entities at the expense of the LLCs and the LLC Investors.  Coley's efforts to conceal these transactions within the financial records of the LLCs materially aided Flaherty in his actions.  Coley had visibility into the misconduct of Flaherty and aided and abetted that misconduct through the preparation of financial records that allowed Flaherty to hide his misconduct from the LLC Investors and relevant governmental entities, thereby perpetuating the misconduct and exacerbating the losses to the LLCs and the LLC Investors resulting from ongoing misconduct.

53.     Not surprisingly given Flaherty's incentives, each of these LLCs was operated in a negligent, grossly negligent, and/or reckless manner that resulted in the LLCs losing money year over year and ultimately resulting in their financial demise.

**E.      Internal Self-Dealing Flips**

54.     As with the ATV Land project, properties were routinely acquired by one Warrior entity (some of which were non-Debtors) and subsequently transferred to another Warrior entity. The first entity received a profit or mark-up for the transfer at the expense of LLC Investors.  These *flips* facilitated the transfer of money away from LLC Investors to entities controlled by Flaherty for his benefit.  The following table outlines some of the flips Flaherty used to divert investor funds.

| THE INTERNAL "FLIPS" | | | | | |
|---|---|---|---|---|---|
| **Common Name** | **Initial Acquiring Entity** | **Acquiring Entity** | **Original Price** | *Flip* **Price** | **Internal Mark-Up** |
| ATV Land | Warrior Development, Inc.[8] | Warrior ATV Golf, LLC | $2,200,000 | $3,000,000 | $800,000 |
| Asheboro | Warrior Acquisitions, LLC | Warrior Golf Equities, LLC | $642,000 | $700,035 | $58,035 |
| Royal St. Augustine | Warrior Acquisitions, LLC | Warrior Golf Equities, LLC | $850,000 | $1,375,000 | $525,000 |
| Baneberry | Warrior Acquisitions, LLC; & Warrior Golf Capital, LLC | Warrior Golf Capital, LLC | $1,240,000 | $2,077,968 | $837,968 |
| Lakota | Warrior Acquisitions, LLC | Warrior Golf Assets, LLC | $2,100,000 | $6,000,000 | $3,900,000 |
| Wolf Creek | Warrior Acquisitions, LLC | Warrior Golf Resources, LLC | $975,000 | $1,053,532 | $78,532 |
| Limestone | Warrior Acquisitions, LLC | Warrior Golf Premium Properties, LLC | $2,000,00 | $2,950,000 | $950,000 |
| Old Still | Warrior Acquisitions, LLC | Warrior Golf Holdings, LLC | $1,024,000 | $1,740,000 | $716,000 |
| Quail Crossing | Warrior Acquisitions, LLC | Warrior Golf Resources, LLC | $1,400,000 | $1,414,221 | $14,221 |
| **Totals:** | | | **$12,431,000** | **$20,310,756** | **$7,879,756** |

### F.    Flaherty's Constant Breaches of His Fiduciary Duties

55.    Throughout the entirety of the history of the LLCs, Flaherty was the manager of record of each LLC.  As manager, Flaherty owed the LLCs and the LLC Investors both a duty of undivided loyalty and a duty of care.

56.    As a result of these fiduciary duties, Flaherty was obligated to act in the best interest of the LLC Investors, and to act in a reasonable, diligent and prudent manner, exercising the utmost care and good faith and to refrain from acting in any manner that would injure or otherwise damage the LLCs or the LLC Investors.  Moreover, as manager-managed LLCs, Flaherty was required to operate them in conformity with each LLCs' operating agreement, as well as California and other state law governing the LLCs.

---

[8] Non-Debtor entity; the Plan has preserved claims against the Non-Debtor entity.

57.    Specifically, Flaherty owed the LLCs and the LLC Investors a fiduciary duty of loyalty pursuant to California Corporations Code section 17704.09 (a) and (b). The duty of loyalty includes: "(1) To account to the limited liability company and hold as trustee for it any property, profit, or benefit derived by the member in the conduct and winding up of the activities of a limited liability company or derived from a use by the member of a limited liability company property, including the appropriation of a limited liability company opportunity[;] (2) to refrain from dealing with the limited liability company in the conduct or winding up of the activities of the limited liability company as or on behalf of a person having an interest adverse to the limited liability company[; and] (3) to refrain from competing with the limited liability company in the conduct or winding up of the activities of the limited liability company."  Cal. Corp. Code § 17704.09(b).

58.    Additionally, Flaherty also owed Plaintiff and the LLC Investors the fiduciary duty of care pursuant to California Corporations Code section 17704.09 (a) and (c). The duty of care required Flaherty to refrain "from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law."  Cal. Corp. Code § 17704.09(c).

59.    However, Flaherty repeatedly and egregiously violated both the duty of loyalty and the duty of care he owed to the LLC and the LLC Investors: First, as discussed above, he repeatedly violated his duty of loyal by (1) engaging in self-dealing flips with internal markups related to the acquisitions of the properties totaling approximately $7.9 million, (2) paying self-described management fees of approximately $22.7 million to himself and/or Non-Debtor Flaherty Entities, and (3) paying personal, non-business expenses of no less than $2.8 million.

60.    Second, Flaherty breached his duty of care by operating the LLCs in a negligent, grossly negligent, and/or reckless manner, through his complete mismanagement, intentional misconduct, and knowing violations the law.  The LLCs had no business plans, budgets, good faith estimates of operations, or financial information or projections for their operation and were never focused on the

17

fundamentals of golf course operation or their ability to turn a profit for the benefit of the LLC Investors. Rather, Flaherty raised excess funds from each LLC to prop up each of the businesses throughout their perpetual losses to continue fund-raising efforts of future LLCs, all for his personal benefit, and all while paying sale commissions (disguised as wages) to Investment Raising Business employees.

61. Unsurprisingly, under the crushing magnitude of Flaherty's self-dealing and mismanagement, the investment scheme collapsed, and the LLCs filed for bankruptcy court protection.

### G.   Flaherty's and Intentional Concealment and Tolling of the Statute of Limitations

62. Throughout the LLCs' existence, Flaherty embarked in an orchestrated scheme to conceal his self-dealing and mismanagement.

63. Flaherty failed to disclose and intentionally hid from the LLC Investors the amounts of the internal "flips" of the properties that allowed him to divert approximately $7.9 million to other entities he controlled. Similarly, the terms of the Self-described Management Fees were likewise hidden from the LLC Investors, resulting in $22.7 million paid out to himself and/or Non-Debtor Flaherty Entities. At no point was any "arms-length" or commercially reasonable method (such as an appraisal or third-party bidding/benchmarking) utilized to determine those amounts or the reasonableness of the agreements, and those amounts/terms were never disclosed to the LLC Investors. Furthermore, Flaherty hid the payment of his non-business/personal expenses totaling approximately $2.8 million from the LLC Investors.

64. Moreover, Flaherty intentionally misrepresented to the LLC Investors and misrepresented in the PPMs the payment of sales commissions to employees equal to 10% of the funds raised, stating that "We are offering the Units for sale by agents and employees of the Managers without sales commission or other remuneration on a 'best efforts' basis."

65.   Given the absolute control over the LLCs and the rejection by Flaherty of efforts of some LLC Investors to obtain financial information regarding their investments in the LLCs, discovery of these violations could not have been made earlier despite reasonable diligence.   Indeed, these violations have only now become known as a result of the resulting bankruptcies of the LLCs and the investigation into their financial affairs by the Chief Restructuring Officer and the Debtors' professionals after the removal of Flaherty from the day-to-day management of the Debtors.

66.   These efforts to conceal the violations of his fiduciary duty, which were materially aided by Coley, postpones the accrual of Plaintiff's claims against Flaherty pursuant to the "discovery rule." Specifically, where a fiduciary obligation is present, courts have long recognized a postponement of the accrual of the cause of action until the beneficiary has knowledge or notice of the act constituting a breach of fidelity.  The existence of a trust relationship limits the duty of inquiry in instances such as this, and when a potential plaintiff is in a fiduciary relationship with another individual, that plaintiff's burden of discovery is reduced.

67.   As a result, the applicable statute of limitations (which is four years under both California and Texas law) regarding Flaherty's breaches of his fiduciary duties of loyalty and care (as described above) have been tolled.

**H.     The 2017 Failed Restructuring Plan.**

68.   Additionally, Flaherty breached his fiduciary duty to the LLCs and the LLC Investors, by devising a transaction that would transfer all assets of the LLCs to another entity, Warrior Golf, LLC, a Delaware limited liability company ("**Golf Delaware**"), which was owned, managed, and controlled by Flaherty.  The proposed transaction is referred to herein as the "Restructuring Plan."

69.   To accomplish the Restructuring Plan, Flaherty retained the services of Dwight Beckstrand (d/b/a Beckstrand Law Offices) (collectively, "**Beckstrand**") for the purpose of, "among other things, restructuring the [Warrior Entities] as to certain golf course investment assets, dissolving

19

and winding up various entities, preparing agreements with investors and business partners, and any other general corporate representation."[9]  Beckstrand aided and abetted Flaherty in the breach of his fiduciary duties by, among other things, advising Flaherty with respect to the failed Restructuring Plan and orchestrating the diversion of the LLCs assets away from the LLC Investors.  Beckstrand furthered this scheme by drafting misleading, false, and/or legally insufficient corporate documents to effectuate the failed Restructuring Plan.

70.     Flaherty was also materially aided by the efforts of Coley during the Restructuring Plan.  Coley assisted with the bookkeeping and preparation of financial information related to the LLCs and had visibility into the misconduct of Flaherty.  Coley aided and abetted misconduct through the preparation of financial records that allowed Flaherty to hide his misconduct from the LLC Investors and relevant governmental entities.

71.     On May 23, 2017, to carry out that unlawful transaction, Flaherty caused the Warrior Entities to send a notice (the "**Notice**") prepared by Beckstrand to all LLC Investors.  The notice falsely represented that the manager, i.e., Flaherty, only needed "a majority approval" of the members to implement the Restructuring Plan. However, pursuant to California Corporations Code section 17704.07(c), Flaherty was required to obtain unanimous consent from all members of the LLCs – a fact he never disclosed to the LLC Investors.

72.     Flaherty, as manager of the LLCs, announced the intention to dissolve each entity and liquidate its assets. Flaherty proposed that each entity liquidate its assets by transferring its golf course operations, including real estate, to Golf Delaware for an inflated and arbitrary amount of debt calculated as 120% of the opinion of value used by the real estate firm Marcus & Millichap ("**M&M**"), and then each LLC purported to issue Golf Delaware's unsecured notes to the former LLC Investors.  The allocable share of the Golf Delaware notes each LLC and each LLC Investor

---

[9] Engagement Letter dated May 16, 2017.

received was calculated using the fraudulent values in the M&M opinion of value.  The M&M report appears to be a brokers' opinion of value and was not prepared by a licensed appraiser and did not utilize standard appraisal methodologies.  M&M grossly overestimated the value of many courses and did not take into consideration the secured loans on the courses to arrive at the net equity value available for investors.  Flaherty, with the assistance of Beckstrand, represented that M&M's opinion of value was an appraisal and used it as the basis for calculating the principal amount of unsecured notes issued by Warrior Delaware to the LLC Investors.  On its face, Flaherty caused Golf Delaware to issue unsecured notes that exceeded over 120% of the inflated value of the courses it owned – rendering Golf Delaware immediately insolvent.

73.    Among its many shortcomings, the Notice did not disclose that Golf Delaware was owned and controlled by Flaherty and that he was its Chief Executive Officer, Secretary, Chief Financial Officer and Agent for Service of Process.  Golf Delaware's business model appears to be the same as the model for the LLCs, but instead of the courses being owned indirectly by the LLC Investors and subject to relatively little debt, now the courses were owned by Golf Delaware, and indirectly Flaherty, and subject to excessive debt and debt service requirements.  Based on the limited terms of the proposed sale that were provided to the LLC Investors in the Notice, each proposed sale transaction as described in the Notice appears on its face to not be commercially reasonable, particularly given the terms of the unsecured note being provided to each LLC and then each LLC Investor in the failed Restructuring Plan.

74.    Plaintiff is informed and believes, and based upon such information and belief alleges, that the Restructuring Plan was outside the ordinary course of activities of the LLCs, and the Notice failed to adequately describe and disclose to LLC Investors the benefit Flaherty and/or Golf Delaware would obtain as a result of the Restructuring Plan. The benefit Flaherty and/or Golf Delaware would obtain as a result of the Restructuring Plan was a material fact for the LLC Investors in determining

whether to approve the Restructuring Plan.  Furthermore, as manager of the LLCs, Flaherty had a fiduciary duty to adequately describe and disclose to the LLC Investors the benefit Flaherty and/or Golf Delaware would receive as a result of the Restructuring Plan.

75.    At no time following the Notice did Flaherty, Beckstrand, or any agent or affiliated entity, adequately describe or disclose the benefit Flaherty and/or Golf Delaware obtained as a result of the Restructuring Plan.  Flaherty's failure to provide such a description or disclosure was and is a breach of Flaherty's fiduciary duty to the LLCs and the LLC Investors. The Restructuring Plan constitutes improper self-dealing on the part of Flaherty and is, in and of itself, a breach of Flaherty's fiduciary duty to the LLCs and the LLC Investors, a breach aided and abetted by Beckstrand.

76.    As a result of Flaherty's failure to provide the LLCs and the LLC Investors, including Plaintiff, with an adequate description and disclosure of the benefit Flaherty would obtain as a result of the Restructuring Plan, any alleged approval by the LLC Investors of the Restructuring Plan was deficient and ineffectual.

77.    Despite the lack of unanimous consent from the LLC Investors, Flaherty caused those entities to carry out the transfer of assets to Golf Delaware, for Flaherty's personal benefit and to the detriment of the LLCs and the LLC Investors. Flaherty likewise caused Golf Delaware to issue promissory notes to the LLC Investors that were essentially worthless but also rendered Golf Delaware insolvent.  Through the subterfuge of causing Golf Delaware to issue the notes, Flaherty and Beckstrand, caused damages to the LLCs and LLC Investors, including delaying the discovery of Flaherty's misconduct and purporting to strip away the rights of the LLCs and LLC Investors and replace them with arguably unenforceable unsecured notes.

I.     **Flaherty's Misappropriation of Debtor's Property**

78.     After engaging in the extensive and repeated breaches of fiduciary duty outlined above, Flaherty continued to engage in malfeasance against the Debtors, including after the Petition Date.

79.     On the Petition Date, certain gold and silver, was located inside an approximately 4-foot tall safe located in the administrative office area on the second floor of the Debtors' headquarters. Upon information and belief, the safe and the contents thereof are property of the Debtors' Estates.

80.     On March 5, 2019, Flaherty was still an employee of the Debtors. On such date Mr. Flaherty held no Officer or Director title with the Debtors (having resigned on March 3, 2019) and was employed in the nature of a consultant to the Debtors and the CRO.  The CRO terminated Mr. Flaherty's employment on June 6, 2019.

81.     On March 5, 2019, Flaherty and others (including Flaherty's two sons), met at the Debtors' office, sometime after 8 p.m. Pacific Time after they confirmed that all professionals employed by Plaintiff and its affiliates had left the building.  Flaherty, then conspired with Aaron Mun (the Debtors' then controller) to disable the Debtors' security cameras so that Flaherty could physically remove certain of the Debtors' assets without permission.  The act of Mr. Mun escorting Plaintiff's personnel from the building and disabling the security cameras was recorded on those very security cameras.  Flaherty, with the aid of his two sons and Mr. Mun, then entered the Debtors' property without authorization and removed the Debtors' assets, again without authorization. Flaherty and his accomplices removed, among other items, several computers and backup drives as well as boxes of gold and silver coins which were stored in the Debtors' safe.  Mr. Rosenthal, as Chief Executive Officer and CRO, did not authorize Flaherty or any other person to be in the Debtors' office after business hours, or to remove the Debtors' assets including computers containing critical business records, backup drives containing copies of files that were unlawfully deleted from the

23

Debtors' servers, and gold and silver coins stored in the Debtors' safe. From and after the Petition Date, Mr. Rosenthal, as the CRO, was the only person that could authorize the removal of the Debtors' assets outside of the ordinary course of business, including computer equipment, financial records and gold and silver coins.

82.     Thereafter, the United States Government seized the computers, backup drives and boxes of gold coins as a part of a raid on Flaherty's home.[10]  Subsequently, Plaintiff was able to regain possession of the computers, backup drives and boxes of gold coins.  The ownership of the gold coins is currently disputed by Flaherty.  However, on information and belief, there is no longer any dispute as to the Debtors' ownership of the computers and backup drives Flaherty removed from the Debtors' headquarters and which were subsequently seized by the United States Government before being turned over to the Debtors.

83.     As discussed above, Debtor Custom Golf and the LLCs generated a massive database of sales leads and "pre-existing relationships" which were critically important to the Debtors' golf club manufacturing business as well as Flaherty's scheme to sell investments to Warrior Custom Golf's customers.  Flaherty used this database to develop investors for the LLCs, the $5 million in loans intended to fund an effort to "go public" and for other schemes such as Warrior Custom Storage & RV, LP, operated by Riverbound Storage Management, LLC (collectively, "**Riverbound**") where LLC investors were invited by the very same boiler room that sold them LLC interests to invest in custom RV storage and "man caves" in the Arizona desert.  Several copies of that database were contained on the computers and drives taken by Flaherty from the Debtors on March 5, 2019.  Plaintiff does not know the full extent to which they were utilized, and the data copied both before and after the computers and drives were seized by the United States Government.  Flaherty's use of this database for Riverbound (as discussed below) and for other purposes has resulted in damages to the

---

[10] The silver coins were not seized by the United States Government and were not turned over to the Plaintiff.

Debtors and has resulted in extensive personal gain for Flaherty in breach of his fiduciary duties to the Debtors.

84.     On information and belief, Flaherty contributed the Debtors' customer database to Riverbound as his capital contribution in exchange for his equity in Riverbound.  On information and belief, Flaherty was paid over $300,000 from Riverbound and received a $450,000 note in redemption of his (or his entities') equity interest in Riverbound.  These transactions reflect an approximation of the value of the Debtors' customer database.  On information and belief, Flaherty utilized that database in an unpermitted manner to capitalize Riverbound for his own economic benefit and to enrich the former Warrior employees partnering with him in that venture.  Flaherty, as he watched the LLC's financial difficulties mount, used Warrior personnel and facilities and the Debtors' customer database to create Riverbound and use it to pivot from a scheme of selling LLC interests related to golf courses to selling equity interests in a "man-cave" RV storage scheme.  On information and belief, some of Riverbound's largest investors are also some of the largest investors in the LLCs.

**J.      Flaherty's Malfeasance Continues**

85.     In addition to using the Debtors' database and other assets for his benefit, Flaherty continually usurped the Debtors' business opportunities for himself.  For example, Flaherty created entities that he owned or controlled to hold liquor licenses for the golf course and caused the transfer of mineral rights from some LLCs to himself.

86.     Specifically, Cimarron Food and Beverage, Inc., Wolf Creek Food and Beverage, LLC, and Warrior Tennessee Food and Beverage, LLC were created to hold liquor licenses for certain courses in California, Georgia, and Tennessee.  Flaherty utilized these entities to usurp corporate opportunities of the Debtors for his own personal benefit.

87.     Flaherty also made a series of smaller transfers for his own benefit, many of which are coming to light as Plaintiff sells the Debtors' remaining golf courses.  For example, Flaherty

transferred the mineral rights in the Baneberry project away from the Debtors to BMF Properties. He also transferred parcels of land as compensation to employees of Warrior Custom Golf and the sales team in the boiler room.

88.    These transfers represent yet other examples of Flaherty's constant and egregious efforts to pilfer the Debtors of anything of value for his own personal benefit. This has resulted in conversion of the Debtors' assets as well as breaches of his duty of loyalty and duty of care with respect to the Debtors.

**IV.**
**Claims and Causes of Action**

**A.    Breach of Fiduciary Duty of Loyalty as to Defendant Flaherty**

89.    Plaintiff repeats the above numbered allegations as if fully set forth herein.

90.    At all relevant times, Flaherty was the manager of the LLCs and made all decisions with respect to the management of each LLC. As such, Flaherty owed a fiduciary duty of loyalty to each LLC and the LLC Investors.

91.    Flaherty, directly and indirectly through his role as manager for all the LLCs, breached his fiduciary duty of loyalty in at least the following ways:

    a.  Violations of duty of loyalty in engaging in self-interested real estate transactions involving internal mark-ups of acquired properties totaling $7.9 million;

    b.  Violations of duty of loyalty in entering into self-interested transactions by paying self-described management fees of approximately $22.7 million himself and/or Non-Debtor Flaherty Entities under commercially unreasonable terms;

    c.  Violations of duties of loyalty in payment of non-business/personal expenses on Flaherty's behalf totaling $2.8 million;

    d.  Violations of duties of loyalty in transferring the mineral interests in the Baneberry project to BMF Properties;

26

e.   Violations of duties of loyalty with respect to the failed Restructuring Plan to transfer substantially all of the assets of the LLCs to another entity outside of the ordinary course of business and in exchange for illusory consideration;

f.   Violations of duties of loyalty through his usurpation of corporate opportunities of the LLCs, including without limitation, with respect to the use of the customer database and transfers of various non-cash assets and opportunities out of the LLCs;

g.   Violations of duties of loyalty through his usurpation of corporate opportunities of the LLCs, including without limitation, creation of corporations to hold liquor licenses for various courses in California, Georgia, and Tennessee;

h.   Violations of his duty to act in the utmost good faith and exercise the most scrupulous honesty toward the LLCs and its members; and

i.   Violations of his duty to place the interests of the LLCs and their members before his own and not use the advantage of his position to gain any benefit for himself at the expense of the LLCs and their members.

92.   Flaherty's breaches of his fiduciary duties of loyalty owed to the LLCs were the proximate direct and consequential cause of significant harm and ultimately led to the financial collapse of the LLCs and injury to the LLCs and the LLC Investors.

93.   The damages incurred by the LLCs is no less than the sum of all funds diverted to himself and/or Non-Debtor Flaherty Entities, an amount no less than $33.4 million.  Moreover, given the massive scope of Flaherty's breach of duties and self-dealing that ultimately led to the financial collapse of the LLCs, the LLCs were damaged in an amount equal to all capital that each LLC raised and each LLC Investor was damaged in an amount equal to their entire investment in the LLCs.

**B.**     **Breach of Fiduciary Duty of Care as to Defendant Flaherty**

94.     Plaintiff repeats the above numbered allegations as if fully set forth herein.

95.     At all relevant times, Flaherty was the manager of the LLCs and made all decisions with respect to the management of each LLC.  As such, Flaherty owed a fiduciary duty of care to each LLC and the LLC Investors.

96.     Flaherty, directly and indirectly through his role as manager for all the LLCs, breached his fiduciary duty of care in at least the following ways:

a.   Violations of duty of care by operating the LLCs in a negligent, grossly negligent, and/or reckless manner and/or engaging in willful misconduct, through complete mismanagement, intentional misconduct, and knowing violations the law;

b.    Violations of duty of care by operating the LLCs in a negligent, grossly negligent, and/or reckless manner and/or engaging in willful misconduct by operating the golf courses without regard to their profitability, prudent maintenance standards, prudent capital improvements or ultimate sales value at the expense of the LLCs and the LLC Investors;

c.   Violations of duties of care in paying sale commissions to employees equal to 10% of the funds raised and disguising those commissions as wages in violation of securities laws and utilizing the assets of other LLCs to fund the sales and operating costs of other LLCs without regard to their separateness or the prudence of any LLC being a lender or borrower to any other LLC; and

d.   Violations of his duty to act in the utmost good faith and exercise the most scrupulous honesty toward the LLCs and its members.

97.     Flaherty's breaches of his fiduciary duties of care owed to the LLCs were the proximate direct and consequential cause of significant harm and ultimately led to the financial collapse of the LLCs and injury to the LLCs and the LLC Investors.

98.     The damages incurred by the LLCs is no less than the sum of all sale commissions to employees equal to 10% of the funds raised (disguised as wages), the operating losses of the LLCs, the reduction in anticipated sale value of the golf courses due to neglect, poor operations, and deferred capital improvements.  Moreover, given the massive scope of Flaherty's breaches of the duty of care that ultimately led to the financial collapse of the LLCs, the LLCs were damaged in an amount equal to all capital that each LLC raised, and each LLC Investor was damaged in an amount equal to their entire investment in the LLCs.

**C.      Negligence as to Defendant Flaherty**

99.     Plaintiff repeats the above numbered allegations as if fully set forth herein.

100.    Because of the above alleged breaches of duty of loyalty, Mr. Flaherty loses the presumption and benefit of the business judgment rule and may, therefore, be sued for simple negligence as the LLCs' manager.

101.    As manager, Flaherty owed the LLCs and the LLC Investors a duty of reasonable care in the operation of the LLCs in a good faithed effort to acquire, operate and dispose of the golf courses profitably for the benefit of the LLC Investors.

102.    However, Flaherty's management of the LLCs was never focused on the fundamentals of the courses (including the ability to purchase and sell them at attractive prices) or their ability to be run profitably for the benefit of the LLC Investors.  Flaherty intentionally failed to (i) conduct meaningful diligence when acquiring golf courses or (ii) develop or provide any business plans, budgets, good faith estimates of operations, or financial information or projections for the LLCs of the LLC Investors.

103.    Flaherty engaged in negligent, grossly negligent, and/or reckless conduct and/or engaging in willful misconduct by (1) engaging in self-dealing flips with internal markups related to the acquisitions of the properties totaling approximately $7.9 million, (2) paying self-described management fees of approximately $22.7 million to himself and/or Non-Debtor Flaherty Entities, and (3) paying personal, non-business expenses of no less than $2.8 million; and (4) paying sale commissions to employees equal to 10% of the funds raised (disguised as wages).  This negligent, grossly negligent, and/or reckless conduct and/or engaging in willful misconduct breached Flaherty's duty of care and thereby caused damage to the LLCs and the LLC Investors.

104.    As a result of Flaherty's negligent, grossly negligent, and/or reckless conduct and/or engaging in willful misconduct, the damages proximately incurred by the LLCs and the LLC Investors is no less than the sum of all funds diverted to himself and/or Non-Debtor Flaherty Entities, an amount no less than $33.4 million, plus the value of the sales commissions paid to employees. Moreover, given the massive scope of Flaherty's breach of duties, negligence, gross negligence and/or reckless conduct and/or engaging in willful misconduct, which ultimately led to the financial collapse of the LLCs, the LLCs were damaged in an amount equal to all capital that each LLC raised, and each LLC Investor was damaged in an amount equal to their entire investment in the LLCs.

**D.    Gross Negligence as to Defendant Flaherty**

105.    Plaintiff repeats the above numbered allegations as if fully set forth herein.

106.    In addition, the breaches outlined above were committed knowingly, with actual malice, and in conscious disregard for the rights and welfare of the LLCs and the LLC Investors.   As a result, Flaherty's actions constitute gross negligence, and Plaintiff is entitled to recover exemplary damages from Flaherty.

107.    The breaches of Flaherty's duties and his negligent, grossly negligent and/or reckless and/or willful misconduct were the proximate, direct, and consequential cause of harm to the LLCs and the LLC Investors.  Plaintiff therefore seeks recovery of exemplary and punitive damages.

### E.    Conversion as to Defendant Flaherty and Non-Debtor Flaherty Entities

108.    Plaintiff repeats the above numbered allegations as if fully set forth herein.

109.    Throughout the Debtors' existence, Flaherty has embarked upon a systematic effort to deprive the LLCs of their assets without lawful justification.  As outlined above, his schemes have included: (1) the *flip mark-ups* of properties addressed above ($7.9 million); (2) self-described management fees of approximately $22.7 million paid out of the LLCs to or on behalf of Mr. Flaherty; (3) payment of Mr. Flaherty's non-business expenses of no less than $2.8 million; (4) the use of one LLC's assets to pay the expenses of other LLCs without regard to their separate existences; (5) breaking into Debtors' headquarters and removing certain computers, backup drives and gold and silver coins; and (6) and transfers of other assets, including the customer database, mineral interests, liquor license interests other interests in real property, and other transfers to Flaherty and Non-Debtor Flaherty Entities.

110.    These actions have proximately damaged the LLCs in an amount no less than the sum of all funds diverted to himself and/or Non-Debtor Flaherty Entities, an amount no less than $33.4 million, plus the value of the customer database, the gold and silver coins, the diverted mineral rights and the value of diverted liquor licenses, and the value of all other interests in property and funds transferred.  Moreover, given the massive scope of the assets converted by Flaherty when compared to the amounts raised by the LLCs, Flaherty's conversions ultimately led to the financial collapse of the LLCs, the LLCs were damaged in an amount equal to all capital that each LLC raised, and each LLC Investor was damaged in an amount equal to their entire investment in the LLCs.

**F.      Declaratory Judgment Regarding Gold and Silver as to Defendant Flaherty**

111.    Plaintiff repeats the above numbered allegations as if fully set forth herein.

112.    As outlined above, Plaintiff is currently in possession of certain gold coins that Flaherty removed from the safe located at Debtors' headquarters after business hours and after the Debtors' security cameras were disabled by an agent of Flaherty in an effort to hide Flaherty's conversion of the gold coins, the computers, and the backup drives.

113.    A dispute currently exists as to the ownership of those gold coins.[11]   Plaintiff, therefore, seeks a declaration from this Court resolving ownership of those gold coins, namely that the gold coins currently in the Plaintiff's possession are property of the Estates.

114.    Moreover, Plaintiff requests an order from the Court declaring that the gold shall remain in the possession of the Plaintiff until determination of its ownership has been made in order to protect and preserve the asset, given the circumstances surrounding the dispute and the high likelihood that if returned to Flaherty, those asserts would be dissipated.  This request will preserve the status quo with respect to preservation of the gold.

**G.      Aiding and Abetting Breach of Fiduciary Duty as to Non-Debtor Flaherty Defendants, Beckstrand, and Coley.**

115.    Plaintiff repeats the above numbered allegations as if fully set forth herein.

116.    As outlined above, Flaherty breached his duty of loyalty and duty of care to the LLCs and the LLC Investors in numerous ways.  For example, many of these breaches involved the *flip mark-ups* of properties addressed above ($7.9 million) or paying exorbitant management fees to Non-Debtor Flaherty Entities totaling approximately $22.7 million, and/or the transfer of assets directly to Non-Debtor Flaherty Entities such as the customer database, interests in real property, and other transfers.

---

[11] See, e.g., Cause No. 19-50026, Dkt. No. 1146, Motion and Statement of Ownership Interest in Certain Gold and Silver Coins filed by Flaherty.

117.     At all times, Flaherty was both the manager of the LLCs and the manager of the Non-Debtor Flaherty Entities.  As a result, the knowledge of his fiduciary duties is imputed to the Non-Debtor Flaherty Entities.

118.     While under his control, the Non-Debtor Flaherty Entities aided and abetted Flaherty in breaching his fiduciary duties by receiving transfers of funds and property from the LLCs and serving as the vehicle by which he stripped the LLCs of their assets.

119.     Similarly, the Beckstrand aided and abetted Flaherty in breaching his fiduciary duties by, among other things, advising Flaherty with respect to the failed Restructuring Plan.  Additionally, the Beckstrand negligently drafted misleading, false, and/or legally insufficient corporate documents to effectuate the failed Restructuring Plan.

120.     As a result of Beckstrand's assistance, Flaherty caused the LLCs to transfer substantially of their assets to another entity without adequate consideration, to his benefit and to the detriment of the LLCs and the LLC Investors in violation of his fiduciary duties and in violation of applicable California law.

121.     As a result of Beckstrand's assistance, Flaherty likewise issued promissory notes (in violation of his fiduciary duties and in violation of applicable California law) to the LLCs and then LLC Investors that were worthless, thereby damaging the LLCs and the LLC Investors.

122.     Coley performed bookkeeping, accounting, tax, and other accounting related services for Flaherty, the LLCs and the Non-Debtor Flaherty Entities.  Throughout Coley's engagement, Coley knew, or should have known, both of Flaherty's fiduciary duties to the LLCs and the LLC Investors and of the massive of misconduct, including extensive personal expenses, improper commissions, and other self-dealing engaged by Flaherty and between the Debtors and the Non-Debtor Flaherty Entities at the expense of the LLCs and the LLC Investors.  Coley's efforts to conceal these transactions within the financial records of the LLCs materially aided Flaherty in his actions.  Coley

had visibility into the misconduct of Flaherty and aided and abetted that misconduct through the preparation of financial records that allowed Flaherty to hide his misconduct from the LLC Investors and relevant governmental entities, thereby perpetuating the misconduct and exacerbating the losses to the LLCs and the LLC Investors resulting from ongoing misconduct.

123.    These actions have proximately damaged the LLCs in an amount no less than the sum of all funds diverted to himself and/or Non-Debtor Flaherty Entities, an amount no less than $33.4 million, plus the value of all other interests in property and funds transferred to the Non-Debtor Flaherty Entities.  Moreover, given the massive scope of Flaherty's breach of duties, conversion, negligence, gross negligence and/or reckless conduct and/or engaging in willful misconduct, which were aided and abetted by the Non-Debtor Flaherty Entities ultimately led to the financial collapse of the LLCs, the LLCs were damaged in an amount equal to all capital that each LLC raised, and each LLC Investor was damaged in an amount equal to their entire investment in the LLCs.

### H.    Negligence as to the Beckstrand

124.    Plaintiff repeats the above numbered allegations as if fully set forth herein.

125.    Flaherty, on behalf of the Warrior Entities, retained the services of Beckstrand for the purpose of, "among other things, restructuring the [Warrior Entities] as to certain golf course investment assets, dissolving and winding up various entities, preparing agreements with investors and business partners, and any other general corporate representation."[12]

126.    At all times, Beckstrand owed a duty to the Debtors to properly represent them in compliance with all applicable California law.  However, Beckstrand breached his duties by, among other things, advising Flaherty with respect to the failed Restructuring Plan in violation of applicable California law.  Additionally, Beckstrand drafted misleading, false, and/or legally insufficient

---

[12] Engagement Letter dated May 16, 2017.

corporate documents to effectuate the failed Restructuring Plan in violation of applicable California law.

127.    As a result of Beckstrand's defective representation, Flaherty caused the LLCs to transfer substantially of their assets to Golf Delaware without adequate consideration, for Flaherty's benefit and to the detriment of the LLCs and the LLC Investors in violation of his fiduciary duties and in violation of applicable California law.

128.    As a result of Beckstrand's defective representation, Flaherty likewise issued promissory notes (in violation of his fiduciary duties and in violation of applicable California law) to the LLCs and LLC Investors that were worthless, thereby damaging the LLCs and the LLC Investors for which suit is now brought.

## VI.
## Prayer

**WHEREFORE**, the Unsecured Creditor Trustee demands judgment against the Defendants:

   A.   Actual damages, including direct and consequential damages in the amount of no less than $33.4 million;

   B.   Exemplary or punitive damages;

   C.   Damages in the amount equal to all of the capital raised by each LLC, totaling approximately $105 million;

   D.   Damages in the amount equal to each LLC Investors investment in the LLCs, totaling approximately $105 million;

   E.   Declaratory Relief as to ownership of the gold coins as outlined above;

   F.   Return to the Debtors of all property converted by Defendants directly and through the usurpation of corporate opportunities, including the mineral interests in the Baneberry project and ownership of Defendants Cimarron Food and Beverage, Inc., Wolf Creek Food and Beverage, LLC, and Warrior Tennessee Food and Beverage, LLC;

   G.   Actual damages against Beckstrand and Coley as outlined above, as well as disgorgement of all fees earned by Defendants Beckstrand and Coley as a result of their representation of Debtors;

H.     Prejudgment and post-judgment interest as allowed by law; and

I.      Costs of court.

J.      For such other and further relief as the Court deems just and proper.


Respectfully Submitted,

**WALSTON BOWLIN, LLP**

*/s/ Clifford H. Walston*
CLIFFORD WALSTON
cliff@walstonbowlin.com
State Bar No. 24037666
4299 San Felipe Street, Suite 300
Houston, Texas 77027
(713) 300-8700
(713) 583-5020 Fax
**ATTORNEY FOR PLAINTIFF**